**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| CHASTITY PEREZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTER FOR VEIN RESTORATION, LLC,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Chastity Perez ("Plaintiff") brings this Class Action Complaint, individually and on behalf of all others similarly situated (the "Class") against the Center for Vein Restoration, LLC ("CVR" or "Defendant"). Plaintiff alleges, upon personal knowledge as to her own actions and her counsels' investigation, and upon information and belief as to all other matters, as follows:

## SUMMARY OF ACTION

1. Plaintiff brings this class action against Defendant on behalf of herself and all other similarly situated individuals, stemming from a data breach impacting nearly 500,000 individuals who entrusted their personal information to Defendant in the course of their employment and/or to receive medical treatment and services (the "Data Breach").

2. CVR is a Maryland-based healthcare services provider with clinics in over 20 states and the District of Columbia, specializing in the treatment of vein diseases.[1]

3. In the regular course of its business, CVR solicits, collects, stores, and maintains highly sensitive personally identifiable information ("PII") and protected health information

[1] *About Us*, Center for Vein Restoration, https://www.centerforvein.com/about (last accessed Dec. 20, 2024).

("PHI") (together, "Private Information") belonging to its employees and patients, including Plaintiff and Class Members.

4. Because CVR "provides services to . . . health care providers that are subject to the Health Insurance Portability and Accountability Act of 1996 (HIPAA)[,] [w]hen CVR collects, uses, and discloses personal information for or on behalf of [those] health care providers, CVR does so in its capacity as a 'business associate' to those health care providers."[2]

5. Plaintiff and Class Members entrusted their Private Information to CVR with the reasonable expectation that CVR would protect their highly-sensitive data from unauthorized access and disclosure.

6. CVR touts its commitment to data security, including in a privacy policy and notice of privacy practices posted on its public-facing website.[3] In these policies, CVR recognizes it "is required by law to maintain the privacy of [its patients'] PHI[.]"[4]

7. CVR failed, however, to implement and maintain adequate data security safeguards to protect the Private Information in its custody.

8. CVR's data security failures resulted in a massive data breach exposing the Private Information of nearly 500,000[5] individuals, including Plaintiff and Class Members.

---

[2] *Privacy Policy*, Center for Vein Restoration, https://www.centerforvein.com/privacy-policy (last accessed Dec. 20, 2024).

[3] *See Privacy Policy*, Center for Vein Restoration, https://www.centerforvein.com/privacy-policy (last accessed Dec. 20, 2024); *Notice of Privacy Practices*, Center for Vein Restoration (revised April 1, 2023), https://www.centerforvein.com/assets/documents/CVR-Notice-of-Privacy-Practices.pdf.

[4] *Notice of Privacy Practices*, Center for Vein Restoration (revised April 1, 2023), https://www.centerforvein.com/assets/documents/CVR-Notice-of-Privacy-Practices.pdf.

[5] *Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information*, U.S. Dep't of Health and Human Services, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Dec. 20, 2024).

9. According to CVR, it "was alerted to unusual activity involving [its] information technology environment" on October 6, 2024.[6]

10. CVR engaged a third-party forensic firm to assist in its investigation and confirmed that an unauthorized threat actor gained access to files containing its employees' and patients' Private Information.[7]

11. CVR did not begin notifying individuals affected by the Data Breach until December 12, 2024, more than two months after it first discovered the Data Breach.

12. In written notification letters sent to Plaintiff and Class Members (the "CVR Data Breach Notice"),[8] CVR confirmed the Private Information compromised in the Data Breach includes: names, addresses, dates of birth, Social Security numbers, driver's license numbers, medical record numbers, diagnoses, lab results, medications, treatment information, health insurance information, provider names, dates of treatment, and/or financial information. For current and former CVR employees, "information related to [their] employment may have been impacted."[9]

13. The CVR Data Breach Notice warned Plaintiff and Class Members to "remain vigilant for incidents of identity theft or fraud by reviewing bank account and other financial statements, as well as credit reports, for suspicious activity."[10]

---

[6] *Notice of Data Security Incident*, Center for Vein Restoration, https://www.centerforvein.com/assets/documents/Notice-of-Data-Security-Incident.pdf (last accessed Dec. 20, 2024) (the "CVR Data Breach Notice").

[7] *Id.*

[8] *Id.*; *see also* **Exhibit A** (CVR Data Breach Notice sent to Plaintiff Perez).

[9] *Id.*

[10] *Id.*

14. CVR specifically encouraged Plaintiff and Class Members to "review the statements [they] receive from [their] healthcare providers and health insurance plans[]" for suspicious or unauthorized activity.[11]

15. The Private Information CVR solicited and collected from its current and former employees and patients is highly valued by criminals because it provides them with the tools they need to commit myriad forms of fraud.

16. Upon information and belief, the Private Information compromised in the Data Breach was exfiltrated by cybercriminals and remains in their possession.

17. CVR offered victims of the Data Breach, including Plaintiff and Class Members only twelve (12) months of identity theft protection services.

18. The Data Breach occurred because CVR failed to implement adequate and reasonable data security procedures and protocols necessary to protect the Private Information it collected and stored from a foreseeable and preventable cyber-attack.

19. Upon information and belief, CVR was targeted in the Data Breach because it collects and maintains a substantial amount of highly valuable Private Information on its systems.

20. As a result of the Data Breach, Plaintiff and Class Members suffered concrete harm including, but not limited to: (i) invasion of privacy; (ii) unauthorized disclosure and/or theft of their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with attempts to remediate and/or mitigate the impact of actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) actual misuse of the compromised data; (vii) nominal damages; and (viii) the substantial and imminent risk of future misuse of the compromised data, which: (a) remains unencrypted and available for unauthorized

---

[11] *Id.*

third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and adequate data security measures to protect their Private Information.

21. CVR collected, stored, and maintained Plaintiff's and Class Members' Private Information in a negligent and/or reckless manner. In particular, the Private Information was stored and maintained by CVR in a condition such that it was highly vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to CVR, and thus, CVR was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

22. CVR disregarded the rights of Plaintiff and Class Members by, among other things, intentionally, willfully, recklessly, and/or negligently failing to implement adequate and reasonable measures to protect their data systems against unauthorized intrusions; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

23. Plaintiff's and Class Members' identities are now at significant risk as a result of CVR's negligent conduct because the Private Information that CVR collected and maintained has been accessed and acquired by data thieves.

24. With access to the Private Information compromised in the Data Breach, data thieves have already engaged in identity theft and fraud. Additionally, the data thieves can and will commit crimes in the future including, for example, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns with Class Members' information,

obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

25. As a direct and proximate result of the Data Breach, Plaintiff and Class Members therefore face a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

26. Plaintiff and Class Members are also likely to incur out of pocket costs as a result of the Data Breach, such as purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

27. Plaintiff brings this class action lawsuit on behalf of herself and all those similarly situated to redress harms flowing from CVR's failure to adequately secure and safeguard Plaintiff's and Class Members' Private Information, and CVR's failure to provide timely and adequate notice to Plaintiff and Class Members that their highly sensitive information had been improperly accessed by an unknown third party.

28. Plaintiff and Class Members have a continuing interest in ensuring their Private Information is properly safeguarded, and they are entitled to injunctive and other equitable relief.

## JURISDICTION AND VENUE

29. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000 exclusive of interest and costs, and members of the proposed Class, including Plaintiff, are citizens of states different from Defendant.

30. This Court has jurisdiction over Defendant because Defendant operates in and directs commerce at this District, and Defendant's principal place of business is located in this District. Defendant intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

31. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is located in this District and a substantial part of the events and omissions giving rise to this action occurred in this District.

## PARTIES

32. Plaintiff Chastity Perez is a resident and citizen of Bronx County, New York. Plaintiff is a current CVR patient and received a letter from CVR, dated December 12, 2024, explaining that her Private Information was improperly accessed by an unauthorized third party in the Data Breach.

33. Defendant Center for Vein Restoration, LLC is a Maryland limited liability company with headquarters and a principal place of business located at 7474 Greenway Drive, Greenbelt, in Prince George's County, Maryland 20770. Upon information and belief, the membership of CVR is comprised of citizens and entities located in Maryland.

## FACTUAL ALLEGATIONS

### *Defendant's Business*

34. With more than 110 locations across the United States, CVR markets itself as "America's Largest Physician-Led Vein Center."[12]

35. In the regular course of its business, CVR solicits, collects, and stores a massive amount of Private Information belonging to its current and former employees and patients.

---

[12] *About Us*, Center for Vein Restoration, https://www.centerforvein.com/about (last accessed Dec. 20, 2024).

36. As a condition of employment, CVR requires its employees to entrust it with their highly sensitive Private Information. Likewise, CVR requires its patients to entrust it with their Private Information in order to receive medical treatment and services.

37. Additionally, CVR receives Private Information from other individuals and entities that are part of an individual's "circle of care," such as referring physicians, other healthcare providers, patients' health plans, close friends, and/or family members.

38. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted their highly sensitive data to CVR absent an implicit assurance that their Private Information would be protected.

39. Upon information and belief, while soliciting and collecting Private Information from its patients and employees, including Plaintiff and Class Members, Defendant promised to provide confidentiality and adequate security to protect that highly sensitive data, including in applicable privacy policies and other disclosures in compliance with statutory privacy requirements.

40. Plaintiff and Class Members, who are current and former CVR patients and employees, relied on CVR's promises to keep their sensitive Private Information confidential and securely maintained, to use that information for valid business purposes only, and to make only authorized disclosures of their Private Information.

41. By soliciting, obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, CVR assumed legal and equitable duties owed to Plaintiff and Class Members and knew or should have known it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

42. CVR claims to "take the privacy and security of [its patients' and employees'] information seriously[.]"[13]

43. Contrary to those representations, however, CVR failed to implement adequate data security measures, as evidenced by CVR's admission of the Data Breach, which affects, to date, hundreds of thousands of individuals.

***The Data Breach***

44. In or around September 2024, a threat actor gained unauthorized access to CVR's internal network.[14] The unauthorized access went undetected until CVR was "alerted to unusual activity involving [its] information technology environment" on October 6, 2024.[15]

45. Following an investigation assisted by a third-party forensic firm, CVR confirmed an unauthorized threat actor gained access to files containing the Private Information of its current and former employees and patients, including Plaintiff and Class Members.[16]

46. CVR waited more than two months, however, before it began notifying individuals affected by the Data Breach on December 12, 2024.[17]

47. In written notification letters sent to Plaintiff and Class Members, CVR confirmed the Private Information compromised in the Data Breach includes: names, addresses, dates of birth, Social Security numbers, driver's license numbers, medical record numbers, diagnoses, lab results, medications, treatment information, health insurance information, provider names, dates of

---

[13] *See* CVR Data Breach Notice.

[14] *See Center for Vein Restoration Data Breach Notification*, Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/26220cc6-86d0-41e4-bd2e-60025867aa25.html (last accessed Dec. 20, 2024) (reporting "Date(s) Breach Occurred: **September 30, 2024**).

[15] *See* CVR Data Breach Notice.

[16] *Id.*

[17] *Id.*

treatment, and/or financial information. For current and former CVR employees, "information related to [their] employment may have been impacted."[18]

48. The CVR Data Breach Notice specifically warned Plaintiff and Class Members to "remain vigilant" by reviewing their financial accounts and medical bills for any suspicious or unauthorized activity."[19]

49. CVR further directed victims to take additional steps to protect themselves, including by monitoring their credit reports, activating credit monitoring and identity theft protection services, and placing fraud alerts and/or security freezes with the three major credit bureaus.[20]

50. The CVR Data Breach Notice explained: "By placing a security freeze, someone who fraudulently acquires your personal identifying information will not be able to use that information to open new accounts or borrow money in your name."[21]

51. The CVR Data Breach Notice failed to inform Plaintiff and Class Members of other critical facts, however, including who perpetrated the Data Breach, when and how cybercriminals gained unauthorized access to CVR's systems, and what actions, if any, CVR had taken to mitigate the harm caused by the Data Breach.

52. CVR owes duties to Plaintiff and Class Members arising under statutory and common law, including HIPAA and its implementing regulations, Section 5 of the FTC Act, industry standards, and its own express and implied promises that it would keep Plaintiff's and

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

Class Member's Private Information secure and protected from unauthorized access and disclosure.

53. CVR failed to implement reasonable data security safeguards and practices appropriate to the sensitive nature of the information they solicited and collected from Plaintiff and Class Members, such as encrypting the information or deleting it when it was no longer needed for valid business purposes.

54. As CVR implicitly recognized in its Data Breach Notice, stolen Private Information is regularly used to perpetrate identity theft and other forms of fraud.

55. Upon information and belief, cybercriminals accessed and acquired files containing unencrypted Private Information belonging to Plaintiff and Class Members in the Data Breach.

56. Plaintiff further believes that her and Class Members' Private Information has or will be published for sale on the Dark Web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type.

57. CVR's failure to promptly notify Plaintiff and Class Members that their Private Information was improperly accessed and/or disclosed in the Data Breach allowed cybercriminals to monetize, misuse, or disseminate that Private Information before Plaintiff and Class Members could take affirmative steps to protect themselves. As a result, Plaintiff and Class Members will suffer – indefinitely – from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

***The Data Breach was Foreseeable***

58. The healthcare industry has been increasingly targeted by cyberattacks,[22] and CVR was aware or should have been aware of the high risk of data breaches.

---

[22] *See* Steve Alder, *Healthcare Data Breach Statistics*, THE HIPAA J. (June 20, 2024),

59. As a HIPAA business associate handling medical patient data, CVR's data security obligations were particularly important given the substantial increase in cyberattacks and data breaches in the healthcare industry preceding the date of the Data Breach.

60. In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), CVR knew or should have known that their electronic records would be targeted by cybercriminals.

61. Further, various governmental bodies have put entities like Defendant on notice of the likelihood of cyberattacks. In a Joint Cybersecurity Advisor, the Federal Bureau of Investigation ("FBI") and the Cybersecurity & Infrastructure Security Agency ("CISA") encouraged critical infrastructure organizations, such as Defendant, to implement their various recommendations as set forth in the advisory to reduce the likelihood and impact of inevitable ransomware and data extortion efforts, including against similar ransomware attacks perpetrated by similar ransomware gangs.[23]

62. Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a

---

https://www.hipaajournal.com/healthcare-data-breach-statistics/ (noting "Between 2009 and 2023, 5,887 healthcare data breaches of 500 or more records were reported to OCR. Those breaches have resulted in the exposure or impermissible disclosure of 519,935,970 healthcare records[,]" and listing the 62 largest healthcare data breaches during that period).

[23] *See, e.g.*, *#StopRansomware: ALPHV Blackcat*, America's Cyber Defense Agency (May 10, 2024), https://www.cisa.gov/news-events/cybersecurity-advisories/aa24-131a.

warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, even smaller entities that store Private Information are "attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[24]

63. Additionally, as companies became more dependent on computer systems to run their business,[25] e.g., working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[26]

64. Defendant knew and understood that unprotected or exposed Private Information is valuable and highly sought after by nefarious third parties seeking to illegally monetize that data through unauthorized access.

65. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if its data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

66. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

---

[24] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection (last visited Dec. 10, 2024).

[25]https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html (last visited Dec. 10, 2024).

[26] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last visited Dec. 10, 2024).

67. The injuries to Plaintiff and Class Members were directly and proximately caused by CVR's failure to implement or maintain adequate data security measures.

68. The ramifications of CVR's failure to keep Plaintiff's and Class Members' Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

69. Defendant, as a healthcare services company and HIPAA business associate, knew, or should have known, the importance of safeguarding Private Information entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

***Data Breaches Are Preventable***

70. CVR could have prevented the Data Breach by, among other things, properly encrypting or otherwise protecting its equipment, electronic record keeping systems, and computer files containing Private Information.

71. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[27]

72. CVR could and should have implemented measures—as recommended by the United States Government—to prevent and detect cyberattacks and/or ransomware attacks, including, but not limited to, the following:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

[27] Ransomware Prevention and Response, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Dec. 20, 2024).

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[28]

73. To prevent and detect cyberattacks and ransomware attacks, CVR could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**
  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audits
  - remove privileged credentials

- **Thoroughly investigate and remediate alerts**
  - Prioritize and treat commodity malware infections as potential full compromise

- **Include IT Pros in security discussions**
  - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely

- **Build credential hygiene**
  - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**
  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events

- **Harden infrastructure**
  - Use Windows Defender Firewall

[28] *Id.*

- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[29]

74. Because CVR collected and stored highly sensitive Private Information belonging to its employees and patients, CVR could and should have implemented all of the above measures to prevent and detect cyberattacks.

75. The occurrence of the Data Breach indicates that CVR failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves accessing the Private Information of Plaintiff and hundreds of thousands of Class Members.

***Defendant Failed to Comply with HIPAA***

76. CVR "provides services to a number of health care providers that are subject to the Health Insurance Portability and Accountability Act of 1996 (HIPAA)[,]" and is therefore a "business associate" as defined by HIPAA and its implementing regulations.[30]

77. Under HIPAA, a "covered entity" is defined as a health plan, healthcare clearinghouse, or healthcare provider that electronically transmits health information in connection with transactions for which the Department of Health and Human Services has adopted standards.[31] A HIPAA "business associate" is a person or entity that "creates, receives, maintains, or transmits protected health information," or PHI, on behalf of a covered entity.[32]

---

[29] *See Human-operated ransomware attacks: A preventable disaster*, Microsoft (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

[30] *Privacy Policy*, Center for Vein Restoration, https://www.centerforvein.com/privacy-policy (last accessed Dec. 20, 2024).

[31] 45 CFR §160.103(4).

[32] *Id.*

78. HIPAA circumscribes security, data privacy responsibilities, and breach-notification obligations designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish standards for electronic transactions and code sets to maintain the privacy and security of protected information.

79. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII and PHI is properly maintained.

80. As a HIPAA business associate, CVR therefore has specific obligations to protect the PHI of its patients, and is subject to HIPAA security, breach notification, and privacy standards.[33] These obligations include implementing comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PHI.

81. Because CVR is a business associate covered by HIPAA (45 CFR §160.102), it is specifically required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and the Security Standards for the Protection of Electronic Protected Health Information ("Security Rule"), 45 CFR Part 160 and Part 164, Subparts A and C. It is also required to follow the Breach Notification Rule. 45 CFR Part 160 and Par 164, Subparts A and D.

82. Despite these clear requirements, CVR failed to adhere to HIPAA's standards. This includes failing to: ensure the confidentiality and integrity of electronic PHI, protect against reasonably anticipated threats, prevent unauthorized uses or disclosures of PHI, and detect and mitigate potential and actual breaches of their security measures.

---

[33] 42 U.S.C. §§17931, 17932, 17934; 45 CFR §§164.302, 164.410.

83. CVR failed to comply with the HIPAA Security Rule because it inadequately maintained its network security, platform, and software, rendering its systems, and the Private Information stored therein, easy prey for cybercriminals.

84. The HIPAA Security Rule "establishes national standards to protect individuals' electronic personal health information that is created, received, used, or maintained by a covered entity" or business associate.[34]

85. CVR's HIPAA security failures include:

a. Failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 CFR §164.306(a)(1);

b. Failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 CFR §164.306(a)(2);

c. Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 CFR §164.306(a)(3);

d. Failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 CFR §164.306(a)(4);

e. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR §164.312(a)(1);

[34] U.S. Dep't of Health & Human Services, The Security Rule, https://www.hhs.gov/hipaa/for-professionals/security/index.html (last accessed June 27, 2024).

f. Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 CFR §164.308(a)(1);

g. Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 CFR §164.308(a)(6)(ii); and

h. Failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 CFR §164.308(a)(5).

86. CVR also failed to comply with HIPAA's Breach Notification Rule.

87. In the event of an unsecured (i.e., unencrypted) breach, notification is required within 60 days to the individuals whose information has been, or is reasonably believed to have been, accessed as a result of the breach if more than 500 people are affected.

88. When CVR finally announced the Data Breach—67 days after it claims to have discovered the unauthorized access—it deliberately downplayed the severity and scope of the Data Breach. The CVR Data Breach Notice sent to Plaintiff and Class Members failed to explain when or how the Data Breach occurred (what security weakness was exploited).

89. HIPAA requires CVR to disclose any unauthorized access and theft of PHI "without unreasonable delay" so that victims can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Private Information.

90. Simply put, the Data Breach resulted from CVR's failures to comply with safeguards mandated by HIPAA and its implementing regulations.

***Defendant Failed to Comply with FTC Guidelines***

91. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

92. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for businesses. The guidelines explain that businesses should:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

93. The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

94. The guidelines further advise businesses: not to maintain Private Information longer than necessary for authorization of a transaction; to limit access to sensitive data; to use an intrusion detection system to expose a breach as soon as it occurs; to monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and to verify that third-party service providers have implemented reasonable security measures.[35]

95. To underscore the binding significance and legal ramifications of the promulgated guidance, the FTC has brought enforcement actions against businesses for failing to adequately

[35] *Id.*

and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

96. These FTC enforcement actions include actions against healthcare providers and their business associates, like CVR.

97. Because these and similar actions were initiated prior to the Data Breach, Defendant knew or should have known that its data security protocols were inadequate and were likely to result in the unauthorized access to and/or theft of Private Information.

98. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duties in this regard.

99. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to its employees' and patients' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

***Defendant Failed to Comply with Industry Standards***

100. Experts studying cybersecurity routinely identify healthcare providers and partners as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

101. Several best practices have been identified that at a minimum should be implemented by healthcare service providers like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

102. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

103. Upon information and belief, Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

104. These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the cybercriminals and causing the Data Breach.

***Value of Private Information***

105. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[36]

---

[36] 17 C.F.R. § 248.201 (2013).

The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[37]

106. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[38]

107. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[39] A cybercriminal who steals a person's PHI can end up with as many as "seven to 10 personal identifying characteristics of an individual."[40] A study by Experian found that the "average total cost" of medical identity theft was "about $20,000" per incident in 2010, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[41]

108. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information at the point-of-sale in a retailer data breach because, there, victims can cancel or close credit and debit card

---

[37] *Id.*

[38] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Dec. 10, 2024).

[39] *See* Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH MAGAZINE (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[40] *Id.*

[41] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/.

accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names, dates of birth, and Social Security numbers.

109. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

110. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[42]

111. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

***Data Breaches Increase Victims' Risk of Identity Theft***

112. The unencrypted Private Information belonging to Plaintiff and Class Members will likely end up for sale on the Dark Web, because that is the *modus operandi* of hackers.

113. Unencrypted Private Information may also fall into the hands of companies that will use the detailed data for targeted marketing without the approval of Plaintiff and Class Members.

[42] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited Dec. 10, 2024).

114. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the data. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

115. Plaintiff's and Class Members' Private Information is of great value to hackers and cybercriminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

116. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[43]

117. With "Fullz" packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

118. The development of "Fullz" packages means that the Private Information compromised in the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other

[43] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/ (last visited Dec. 10, 2024).

words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was accessed in the Data Breach, criminals may still easily create a comprehensive Fullz package and sell it—and then resell it in perpetuity—at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

***Loss of Time to Mitigate Risk of Identity Theft & Fraud***

119. Cyberattacks like the Data Breach are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

120. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft face "substantial costs and time to repair the damage to their good name and credit record."[44]

121. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

122. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, in part because CVR has yet to provide Plaintiff and Class Members with critical

[44] *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf (last visited Dec. 10, 2024).

information about the Data Breach. Accordingly, the Data Breach has caused Plaintiff and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

123. Plaintiff's mitigation efforts are consistent with the GAO Report, which notes that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[45]

124. Plaintiff's and Class Members' mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[46]

***Diminution of Value of Private Information***

125. Private Information is a valuable property right.[47]

126. Sensitive PII can sell for as much as $363 per record, according to the Infosec Institute.[48]

---

[45] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited Dec. 10, 2024).

[46] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited Dec. 10, 2024).

[47] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report") (last visited Dec. 10, 2024).

[48] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

127. An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[49]

128. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[50,51]

129. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[52]

130. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. This transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

131. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if its data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

132. The fraudulent activity resulting from the Data Breach may not come to light for years.

---

[49] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Dec. 10, 2024).
[50] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Dec. 10, 2024).
[51] https://datacoup.com/ (last visited Dec. 10, 2024).
[52] https://digi.me/what-is-digime/ (last visited Dec. 10, 2024).

133. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

134. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement and maintain adequate data security measures to protect Plaintiff's and Class Members' Private Information.

***Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary***

135. Given the type of targeted attack in this case, sophisticated criminal activity, and the type of Private Information involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/Dark Web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes –e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

136. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

137. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

138. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from the Data Breach.

***Loss of Benefit of the Bargain***

139. Furthermore, Defendant's poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendant for medical treatment and services, Plaintiff and other reasonable consumers understood and expected that they were, in part, paying for the services and necessary data security to protect their Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

***Plaintiff Chastity Perez's Experience***

140. Plaintiff Chastity Perez is a current CVR patient.

141. As a condition of receiving medical treatment and services from CVR, Plaintiff was required to entrust CVR with her Private Information, including highly sensitive medical and health information.

142. Upon information and belief, at the time of the Data Breach, CVR stored and maintained Plaintiff's Private Information in its systems.

143. Plaintiff Perez is very careful about sharing her sensitive Private Information. Plaintiff Perez stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted her Private Information to CVR had she known of CVR's lax data security policies.

144. Upon information and belief, Plaintiff's Private Information was targeted, accessed, and acquired in the Data Breach.[53]

---

[53] See footnote 8

145. As a result of the Data Breach, Plaintiff Perez made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

146. Plaintiff suffered actual injury as a result of the unauthorized access and disclosure of her Private Information in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of her Private Information; (iii) lost or diminished value of her Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of her bargain; (vi) nominal damages; and (vii) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in CVR's possession and is subject to further unauthorized disclosures so long as CVR fails to undertake appropriate and adequate measures to protect her Private Information.

147. Plaintiff additionally suffered actual injury in the form of a significant increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of her Private Information was caused, upon information and belief, by the fact that cybercriminals can easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

148. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that CVR has still not informed Plaintiff of key details about the Data Breach.

149. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

150. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

151. Plaintiff Perez has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in CVR's continued possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

152. Plaintiff brings this nationwide class action on behalf of herself and on behalf of all others similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or 23(c)(5).

153. The Class that Plaintiff seeks to represent is defined as follows:

> **Nationwide Class**
> All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach (the "Class").

154. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

155. Plaintiff reserves the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

156. Numerosity: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiff and exclusively in the possession of Defendant, upon information and belief, hundreds of thousands of individuals were impacted. The Class is apparently identifiable within Defendant's records.

157. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class Members, including the following:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether Defendant had a duty not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendant had a duty not to use the Private Information of Plaintiff and Class Members for non-business purposes;

d. Whether Defendant failed to adequately safeguard the Private Information of Plaintiff and Class Members;

e. Whether and when Defendant actually learned of the Data Breach;

f. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

g. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

h. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Plaintiff and Class Members are entitled to actual damages and/or nominal damages as a result of Defendant's wrongful conduct;

k. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

158. Typicality: Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

159. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

160. Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that she has no disabling conflicts of interest that would be antagonistic to

those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages she has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

161. Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

162. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action

alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

163. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

164. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

165. Unless a Classwide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

166. Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a classwide basis.

167. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant failed to timely notify Plaintiff and the Class of the Data Breach;

b. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

d. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e. Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

f. Whether adherence to HIPAA requirements, FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

**CAUSES OF ACTION**

**COUNT I**
**Negligence**

**(On Behalf of Plaintiff and the Class)**

168. Plaintiff repeats and reallege the factual allegations contained in paragraphs 1 through 151 as if fully set forth herein.

169. Defendant solicited, collected, stored, and maintained the Private Information of Plaintiff and the Class.

170. Defendant acquired its employees' and patients' non-public Private Information in the ordinary course of providing medical treatment and services.

171. Plaintiff and Class Members entrusted Defendant with their Private Information with the reasonable and mutual understanding that Defendant would safeguard their information.

172. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

173. By voluntarily undertaking and assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer systems—and Class Members' Private Information held within—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duties included a responsibility to implement processes by which they could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

174. Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

175. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks adequately protected the Private Information in its custody.

176. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential Private Information, a necessary part of being employees and/or patients of Defendant, and because Defendant was in a superior position to ensure that its data security practices were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

177. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

178. Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

179. Defendant also had a duty to exercise appropriate clearinghouse practices to remove former employees' and patients' Private Information it was no longer required to retain pursuant to regulations.

180. Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

181. Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and/or fraudulent misuse of their Private Information by third parties.

182. Defendant breached its duties, pursuant to HIPAA, the FTC Act, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Allowing unauthorized access to Class Members' Private Information;

d. Failing to detect in a timely manner that Class Members' Private Information had been compromised;

e. Failing to remove former employees' and patients' Private Information it was no longer required to retain pursuant to regulations; and

f. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

183. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

184. Plaintiff and Class Members are within the class of persons the FTC Act was intended to protect and the type of harm that resulted from the Data Breach is the type of harm that the statute was intended to guard against.

185. Defendant's violation of Section 5 of the FTC Act constitutes negligence.

186. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

187. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

188. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

189. Defendant had full knowledge of the sensitivity of the Private Information it collected and stored, and the types of harm that Plaintiff and the Class could and would suffer if their Private Information was wrongfully accessed and/or disclosed.

190. Plaintiff and the Class were the foreseeable and probable victims of any inadequate data security practices and procedures. Defendant knew or should have known the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate security to protect that Private Information, and the necessity of encrypting Private Information stored on Defendant's systems.

191. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

192. Plaintiff and the Class had no ability to protect their Private Information after they entrusted it to Defendant.

193. Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

194. Neither Plaintiff nor Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

195. Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place

to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

196. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

197. There is a close causal connection between Defendant's failure to implement and maintain adequate data security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as a proximate result of Defendant's failure to exercise reasonable care in safeguarding their Private Information by adopting, implementing, and maintaining appropriate data security measures.

198. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of their bargain; (vi) a significant increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains in Defendant's continued possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

199. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risk of exposure of their Private

Information, which remains in Defendant's continued possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

200. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

201. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring and identity theft protection services to all Class Members.

## COUNT II
## Breach of Implied Contract

**(On Behalf of Plaintiff and the Class)**

202. Plaintiff repeats and reallege the factual allegations contained in paragraphs 1 through 151 as if fully set forth herein.

203. Defendant solicited, collected, stored, and maintained the Private Information of Plaintiff and the Class.

204. Plaintiff and Class Members entrusted their Private Information to Defendant to receive employment and/or medical treatment and services from Defendant. Plaintiff and Class Members paid money to Defendant in exchange for medical treatment and services and would not have paid for Defendant's services, or would have paid less for them, had they known that Defendant's data security practices were inadequate to protect their Private Information.

205. Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

206. Plaintiff and Class Members entrusted Defendant with their Private Information with the reasonable and mutual understanding that Defendant would safeguard their information.

207. Defendant accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing employment and/or medical treatment and services to Plaintiff and Class Members.

208. When Plaintiff and Class Members provided their Private Information to Defendant for the purpose of employment and/or receipt of medical treatment and services, they entered into implied contracts with Defendant.

209. Plaintiff and the Class Members therefore entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect their Private Information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

210. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations (including HIPAA and FTC guidelines on data security) and were consistent with industry standards.

211. Implicit in the agreements between Plaintiff and Class Members and Defendant, was Defendant's obligation to: (a) use such Private Information for valid business purposes only; (b) take reasonable steps to safeguard that Private Information; (c) prevent unauthorized access to and/or disclosures of the Private Information; (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information; (e) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from

unauthorized disclosure or uses; and (f) retain the Private Information only under conditions that kept such information secure and confidential.

212. The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

213. On information and belief, at all relevant times Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

214. On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' Private Information would remain protected.

215. Plaintiff and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of those payments to obtain adequate data security. Defendant failed to do so.

216. Plaintiff and Class Members would not have entrusted their Private Information to Defendant or paid for Defendant's services in the absence of an implicit assurance that Defendant would keep their Private Information secure from unauthorized access and/or disclosure.

217. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of an implied promise to monitor its computer systems and networks to ensure it adopted reasonable data security measures.

218. Every contract in this State has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

219. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

220. Defendant breached the implied contracts made with Plaintiff and the Class by failing to safeguard and protect their Private Information, by failing to delete the information once the relationship ended, and by failing to provide adequate notice to them that their Private Information was compromised as a result of the Data Breach.

221. Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard Private Information, failing to timely and accurately disclose the Data Breach to Plaintiff and Class Members, and continued acceptance and storage of Private Information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

222. As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of their bargain; (vi) a significant increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains in Defendant's continued possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

223. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

224. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring and identity theft protection services to all Class Members.

## COUNT III
## Unjust Enrichment

**(On Behalf of Plaintiff and the Class)**

225. Plaintiff repeats and reallege the factual allegations contained in paragraphs 1 through 151 as if fully set forth herein.

226. Plaintiff brings this Count in the alternative to their claim for breach of implied contract.

227. Upon information and belief, Defendant funds any data security measures it implements entirely from its general revenues, including from money it makes based upon representations that it would protect Plaintiff's and Class Members' Private Information.

228. Thus, there is a direct nexus between money paid to Defendant and the requirement that Defendant keep Plaintiff's and Class Members' Private Information confidential and protected.

229. Plaintiff and Class Members paid Defendant a certain sum of money, or a certain sum of money was paid on their behalf, which was used to fund any data security measures implemented by Defendant.

230. As such, a portion of the payments made by or on behalf of Plaintiff and Class Members is to be used to provide a reasonable and adequate level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

231. Protecting the Private Information of Plaintiff and Class Members is integral to Defendant's business. Without their data, Defendant would be unable to provide the medical treatment and services that comprise Defendant's core business.

232. Plaintiff's and Class Members' Private Information has monetary value.

233. Thus, Plaintiff and Class Members conferred a monetary benefit on Defendant when they entrusted their Private Information to Defendant. Specifically, Plaintiff and Class Members paid Defendant for medical treatment and services, and in so doing also provided Defendant with their Private Information. In exchange, Plaintiff and Class Members should have received from Defendant the services that were the subject of the transactions and should have had their Private Information protected with adequate data security.

234. Defendant knew that Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from Plaintiff's and Class Members' Private Information and used Plaintiff's and Class Members' Private Information for business purposes.

235. Defendant failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not fully compensate Plaintiff and Class Members for the value that their Private Information provided.

236. Defendant acquired Plaintiff's and Class Members' Private Information through inequitable record retention as it failed to investigate and/or disclose the inadequate data security practices previously alleged.

237. If Plaintiff and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their Private Information, they would not have entrusted their Private Information to Defendant or obtained services from Defendant.

238. Plaintiff and Class Members have no adequate remedy at law.

239. Defendant deliberately enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of data security that would have prevented the Data Breach, Defendant instead calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite data security and the safety of Plaintiff's and Class Members' Private Information.

240. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

241. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: : (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of their bargain; (vi) a significant increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains in Defendant's continued

possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

242. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

243. Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT IV**
**Breach of Third-Party Beneficiary Contract**

**(On Behalf of Plaintiff and the Class)**

244. Plaintiff repeats and reallege the factual allegations contained in paragraphs 1 through 151 as if fully set forth herein.

245. Upon information and belief, Defendant entered into HIPAA Business Associate Agreements ("BAAs") with various covered entities—including, but not limited to Plaintiff's and Class Members' respective healthcare providers and health plans.

246. Those contracts were made expressly for the benefit of Plaintiff and Class Members, whose confidential medical information Defendant solicited, collected, stored, and maintained, to provide services to Plaintiff and Class Members and/or to Plaintiff's and Class Members' respective healthcare providers and health plans.

247. Plaintiff and Class Members were the intended beneficiaries of the contracts entered into by Defendant and Plaintiff's and Class Members' respective healthcare providers and

health plans—there would be no need for Defendant's services aside from the benefit to Plaintiff and Class Members. The contracts between Defendant and Plaintiff's and Class Members' respective healthcare providers and health plans were therefore clearly intended for the benefit of Plaintiff and Class Members, and the benefits of those contracts were directed at Plaintiff and Class Members.

248. That Plaintiff and Class Members would rely on the contracts between Defendant and Plaintiff's and Class Members' respective healthcare providers and health plans to ensure the security of their Private Information was foreseeable to Defendant.

249. Defendant breached its contracts with Plaintiff's and Class Members' respective healthcare providers and health plans when it failed to use reasonable data security measures to adequately protect Plaintiff's and Class Members' Private Information from unauthorized access and disclosure.

250. Plaintiff and Class Members were foreseeably harmed by Defendant's failure to use reasonable data security measures, as alleged herein.

251. Accordingly, Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A. An Order certifying the Class, and appointing Plaintiff and her Counsel to represent the Class;

B. Equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

C. Injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to delete, destroy, and purge the Private Information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information, for Plaintiff's and Class Members' respective lifetimes;

v. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Defendant to segment data by, among other things, creating firewalls and controls so that if one area of Defendant's network is compromised, hackers cannot gain access to portions of Defendant's systems;

x. requiring Defendant to conduct regular database scanning and securing checks;

xi. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling Private Information, as well as protecting the Private Information of Plaintiff and Class Members;

xii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting Private Information;

xiv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential Private Information to unauthorized third parties, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvii. for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment;

D. An award of damages, including actual, statutory, nominal, consequential, and punitive damages, as allowed by law in an amount to be determined;

E. An award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. Prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: January 6, 2025

Respectfully submitted,

*/s/ James J. Pizzirusso*
James J. Pizzirusso
(D. Md. Bar No. 20817)
HAUSFELD LLP
888 16th Street N.W., Suite 300
Washington, D.C. 20006
T: 202.540.7200
jpizzirusso@hausfeld.com

Steven M. Nathan
(D. Md. Bar No. 30618)
HAUSFELD LLP
33 Whitehall Street 14th Floor
New York, New York 10004
T: 646.357.1100
snathan@hausfeld.com

*Counsel for Plaintiff*